Before we start the proceedings of our cases today, I'll turn the gavel over to Judge O'Malley. I get to preside for a brief moment this morning for an important motion that Judge Crouse wants to make to the Court, and I'm not going to presage it. I will let her announce what the purpose of the motion is and make some remarks. Well, firstly, I'd move the motion of admission of David Kenneth Mraz, who is a member of the Barrington standing of the highest courts of Washington, D.C. and New Jersey. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. And I'd simply like to add today that these moments are usually bittersweet for me because we're celebrating kind of the culmination of our clerk's year or two with us. And so it's with a thrill to have had the pleasure of working with Dave, who's just been a tremendous asset to our chamber. He possesses not only the smarts but also the integrity, I think, to be a tremendous advocate. We've also had the joy of getting to know his wife and son while he's been with us in chambers. And the only good part of the news for me in losing him is that he'll remain in Washington, D.C., so he'll remain close to us and a part of our family. So with that, I move his admission. Hearing no objections, Mr. Mraz, you will be admitted to the Court. I'm going to ask Mr. Horvely to swear you in, and I want to extend my welcome on behalf of the Court as a whole as well. You've been a great addition to the entire Court and not just to Judge Prost's individual chambers. So congratulations. Mr. Horvely? I take your right hand. I swear infirmly that you will report yourself as attorney and counsel of this Court, uprightly and according to the law, and shall support the Constitution of the United States of America. I do. Congratulations. Welcome to the Bar and the United States Court of Appeals. Thank you. Congratulations. And now you can get back to work. With that, we'll begin with our first case today, which is 2011-5052, Bannum, Inc. v. United States. Mr. Camarado? Before we start the clock, I just want to ask you, and we encounter this in quite a number of our cases, which are confidentiality markings, which kind of constrain or at least raise questions as to what we can ask an argument, what we can write an opinion. So would you care to – I mean, are all the confidentiality markings in these briefs necessary? That's a very good question, Your Honor. I've had this dilemma throughout the Federal Court of Claims, and there's a very restrictive imposition on being an advocate for the client. The only thing I can say about the confidentiality here, it is under seal. We were under seal before the Federal Court of Claims. When the Federal Court of Claims issued their decision, their public decision on December 28, 2010, they also redacted out a lot of material. So in keeping with the Federal Court of Claims public decision, I would request that the Court not go into any materials that were redacted out of the decision and leave it at that. But I'm going to try to – I think I can discuss this case without going into any confidential, sensitive information. If there is a question, I could probably refer you back to the record someplace that's under seal. Well, with that, why don't we proceed? But, Your Honor, I would ask that somewhere along the line, somebody take a look at these protective orders in these government procurement cases. They are very inhibitive to dealing with your client and dealing with the courts and things of that nature. And in my opinion, just quickly here, in my opinion, if you want to get into the public contracting forum, everything should be public, and there shouldn't be anything secret to begin with. But I'll leave it at that. Good morning. Speak up just a little bit. Yes. Good morning. If it would please the Court, my name is Joseph Camargo, Jr., and I represent the appellate in Banham in this case. Again, this matter was filed under seal, and I will attempt to avoid discussing any specific matters that I believe is protective since this is a public forum. I believe the specifics are discussed in detail in all of our briefs. Now, roughly, this solicitation was issued and involved with procurement of a residential reentry center or a halfway house by the Bureau of Prisons. The BOP, Bureau of Prisons, utilized certain evaluation factors to pick the best contractor, which included a review of the past performance, which was the most important. They reviewed your technical management proposal, which was the secondary of most importance, and they also looked at the price, which was the least important. Past performance, again, was the most important. There were only two companies in the running for this procurement, Banham and Dismiss Charities. Banham was the incumbent. It had stellar ratings and had the lowest prices. So what is the nub of your contest with respect to the award? I'm sorry, ma'am? I mean, what did you get to the issues that you want to raise with respect to why the conduct was? The first basis of the protest was a solicitation containing an estimated number of mandates and had a cap on a cumulative number of mandates, not on a daily number of inmates that can be housed at the facility. And I think the federal court of claims and the government and the contractor that was awarded the contract all looked at this thing as some sort of maximum of 50 mandates of men or inmates that could be housed at the facility per day. We believe that there was no maximum. The maximum came in exactly like the solicitation said, that you look at the cumulative total of 18,250. In other words, you look at the end of the contract. To the court of claims judge's conclusion that if, in fact, the solicitation were to be interpreted as you interpreted it, you wouldn't have been able to satisfy it either. Well, we had no restriction on zoning, okay? Dismiss House qualified their proposal with respect to zoning. Their zoning limited them to 50. Yeah, but you could see you had a restriction that you couldn't go beyond 62. We had a restriction, Judge, Your Honor, just on the number of people we could house there. We could always add on to our facility if need be. I think we made that point. So you could get up to 1,000 or 2,000? Well, whatever we needed it to be, we were unrestricted. We were at the airport and we had no restriction on our zoning. So as big as the facility that we needed, we could always expand and add on. Did you ask the BOP to reduce the number of beds? We did that from a point of view as to how you price your proposal out. We felt that maybe the estimates that they were given were a little bit unreasonable, a little high in nature, and they should be reduced only for them. Isn't that your PTAR there? You requested that the specification be changed in such a way, and you're now appealing, I guess, that decision. We requested that the estimated days be reduced and not that there was any sort of maximum limiting us. So it was all intertwined with the estimation of the 50 million days per. Are you saying that at the price that you bid, that you would have been willing to add on a whole wing to your facility to get to this huge number by inmates, so much per inmate that you housed the facility. So the more the BOP wants to put in, the more you get paid. There's no restriction on it. It's an estimated amount that you're getting paid, and it's an estimated number of man days that you have in the contract. But you admit that the price that you put into the solicitation would correspond to this 50 inmate estimate, would it not? That's correct. To that 50 inmate or 18 to 50 for the year. But again, there was no qualification on our proposal. Now DSMIS came forth, and this is one of our big arguments here, DSMIS came forth, they qualified your proposal. And that proposal should have never been accepted by the BOP because it results in a violation of the competitive bidding laws. And as we say in a couple of cases in our brief, the Candle Corps case basically says that you can't relax the solicitation requirements for one contract or not the other. We had no restriction. They had a restriction. They qualified it. We didn't qualify it. There's historical data in the record that shows that a 50, in a situation such as this, that the 50 bed limit is never met because you have furloughs, you also treat people on a daily basis, so you really never get to the 50 limit. If that's the case, then what's the issue? But then that's all speculation, Your Honor, with all due respect. I mean, if they wanted a maximum in the contract, they should have specified a maximum. They didn't do that. They never said there was a maximum. The solicitation itself says that 20 percent of the beds should be devoted for furloughs. Right, but that's not up to the contractor. That's, I think, where the judge didn't recognize this situation properly. It's up to the Bureau of Prison who they want to go off on furlough and who they want to go off on home confinement. That's not up to the contractor to determine that. In other words, the judge wrote her opinion from the point of view that you could never reach the 50 because the contractor could put people off on furlough or the contractor could put people off on home confinement. The contractor has no right to do that. It's directed by the Bureau of Prisons who they want to go off on. Wasn't the 50-bed limit, doesn't that include a 20 percent furlough number? An estimated amount. An estimated, okay. Estimated amount, but it's not based on a 50. But doesn't that mean that either way, 50 is the limit? No, it doesn't. 18,250 was the limit. I think the specifications are very clear. Everybody wants to interpret this thing a different way. It says 18,250 is the maximum amount. If you exceed 18,250 for that particular year, then you have a right to reject. In other words, if they come in with 60 on a particular day and dump 60 on your doorstep, DSMIS can't do it because now they've got a restriction on their zoning. It's a qualified proposal. Are you saying that if they came in with 200 or 2,000 on a given day that you could have handled that? We could have expanded to handle it. There was no restriction on our zoning. You would have had to build a whole new building. I mean, the fire code said 62, right? Well, if we had known in advance that they were going to be placing more people and the increase was going up, you could have always expanded. In other words, we didn't have that restriction on our proposal. There was no restriction there. That's the difference. One person is coming in restricting their proposal, okay, and Bantam is not restricting their proposal. That's an uneven competitive situation. Is that a boundless amount of property out there at the airport? Well, Judge, again, it's all speculation. Once you get into the game, but we both have to get to that game first, and there are certain guidelines and certain rules that are imposed as to how you're going to evaluate who plays in the game. Once the game goes on, that's a little different scenario. I mean, we just can't change the rules of the game to fit a particular situation. That's what's being done here. I mean, the rules were established ahead of time. I think the solicitation is very clear. Everybody wants to read it a different way, but it says very clearly 18-250 for a year. You're right to reject, and there shouldn't be any qualifications on it. Why don't you move on to your performance rating issue before you run out of time? Now, the performance rating issue, there's two performance rating issues. One involves your technical management proposal, and you were supposed to be evaluated based on your site validity and your site location and things of that nature. And we got the same score as Dismas got, even though Dismas had the restriction. We had unlimited. In other words, according to the way I read the grading system there, if you can meet or exceed the government requirements, in this case the government was requiring 50, and we exceeded it, we should have been given a higher score for that, and that could have pulled up our technical management proposal. Now, on the past performance, the past performance very clearly says that your most recent present past performance information shall be considered. And in this particular case, it's very clear that the BOP considered past performance information dating back two or three years earlier. Is a BOP required to consider the most recent past performance information? I think the solicitation is very clear. It says present information is critical. That's not what I'm asking. Is a BOP required to consider most recent and give priority to most recent information, or do they have the discretion to consider the most recent information? Well, discretion is one thing. The specification or solicitation is something else. The solicitation says very clearly present. You shall consider present information. But they didn't look at the most recent final performance. They looked at the most recent CEFs, the contract evaluation form. Right. So you're saying that they should have looked at some interim evaluations. Well, there was recent present past performance information available in contract monitorings. They come in and do inspections on a bi-yearly basis or yearly basis. So they had information, and that's what they based the CEFs on anyways. Then it was unabstinished. But the CEFs are based on a cumulative series of interim reports, and you're saying that they should have just looked at the most recent interim report and ignored what the cumulative effect of those reports was. Well, the CEFs that they had finalized dated back two or three years. Then there was some un-finalized CEFs that basically Bantam increased, and the un-finalized CEFs are not going to. Even if Bantam challenged the un-finalized CEFs, their scores wouldn't go down. So if you look at the un-finalized CEF and you saw that particular contract that you were complaining about, and you gave Bantam a lower score based upon that, it increased. Obviously, I submit that it should have been looked at and not discounted. And if the solicitation or specification says you will base it on CEFs, that would be one thing. But in this case, they didn't base it on it. They didn't say anything in the statement or work of the solicitation that says you base it upon CEFs. It says past performance, present past performance information. You're into your rebuttal time, so do you want to get down on your feet? Thank you, Mr. Mark. Mr. Oliver? Yes, Your Honor. Now you're dividing up time. You're taking 12 minutes and the other gentleman is taking three? Yes, Your Honor. May it please the Court. Crux of Bantam's argument is that the solicitation requires that contracts be able to accommodate more than 50 inmates per day, and that dismissal facility cannot meet that requirement because of a Savannah zoning ordinance. However, the record is clear that all of the parties, Bantam, Bureau of Prisons, as well as dismiss, understood that the solicitation required contracts be able to accommodate a maximum of 50. We know that by looking at, for instance, a letter that Bantam wrote to BOP at the Joint Appendix page 10893A, which Bantam said, this solicitation only requires that Bantam provide up to 50 beds, parentheses, 50 offenders. And there's numerous other statements that the government has outlined that's briefed to that same effect by Bantam. Are we supposed to be bound by those communications? I mean, isn't it our obligation to interpret the solicitation? Yes, Your Honor. You're not bound by those statements, but the fact that all the parties did, in fact, understand the solicitation in that way, it should be no surprise in light of the fact that the only reasonable interpretation of the maximum order provision is that which states that the BOP is not obligated to honor any amount in excess of 18,250 inmate days. Now, that averaged on a daily basis is 50 inmates per day. Wouldn't it have made more sense if the solicitation said 1,800 for a maximum of 50 per day? It would have been clearer, perhaps, just looking on the face of it, if it said 50 inmates per day. It did not. However, the government's position is that the only reasonable interpretation of that maximum order provision is to interpret 18,250 to mean 50 inmates per day. That's the way the parties understood it, but beyond that, just in terms of matter of interpretation and what's reasonable, you have to remember that this procurement involves the provision of facilities that can only house so many inmates, and the purpose of the maximum order provision is to provide notice to offerors as to how big the facility must be, how many inmates they must be able to accommodate per day, or how many beds that they must be able to provide in their residential facility. Under Banham's theory, in which there is no cap on the maximum number of inmates per day, the number of inmates can go from 200 at one point to 400 to 500, back down to 50, and you don't know, under Banham's theory, what the maximum number of inmates that any particular offeror has to be able to accommodate until well in, two-thirds, three-quarters, perhaps, into the contract year until it reaches this 18,250 number. That doesn't make any sense. Why isn't it relevant that the Savannah zoning regulations would prohibit the competitor from going above 50 beds? Yes, there's no question that the Savannah ordinance does limit any, well, according to Banham, it's outside of Banham, but it limits any facility, any business from operating a residential facility with more than 50 beds. You limit it to 50, however... See, the problem I'm having is that you base, the number 50 is an estimate, right? It comes down to an average, it's an average number. Correct, it's an average of the 18,250. But there's nothing in the solicitation that says it shall never go above 50, and it seems to me that on a particular day or maybe a month, the demand could be such that on that day it drives it above 50. And the competitor obviously could not go above 50. Well, if you look at the maximum provision, you're right, Your Honor, that it does not say 50 inmates per day. It says the 18,250. But the only way to interpret the 18,250 is what does that mean in the context of how big the facility must be, how many inmates per day or beds the off-ward must be able to accommodate. Now, BOP was very aware of this limitation. It was, in fact, brought to BOP's attention by dismiss, it's in the record. But Banham wasn't subject to that limitation, only you. Banham claims that they're not subject to that limitation. However, it's also clear, as the lower court found below, that Banham, based upon an inspection, can only hold only two more inmates, 52 inmates. So it's only two more than what dismiss can hold. And so, again, that goes to the issue of prejudice, why the lower court was correct on the issue of prejudice, because if you... Well, the present facility can hold 52, but they have no capacity limitation, whereas your client does have a capacity limitation. There's no way you can go above 50 and the sky's the limit with Banham. Well, I mean, I think that as a practical map, it's true that dismiss cannot go over 50. However, Banham's facility is what it is. In other words, they claim that it's expandable and that it can build some hypothetical building, perhaps an additional building. I mean, but at the end of the day, what their theory is, well, there's no cap on the number of reddits per day. But that, again, doesn't make any sense in terms of how to interpret this maximum order of provision, precisely because facilities, by their nature, at some point are bound and there's a limit to how much you can house on any particular day. And, again, if you accept their theory that there's no cap, even if they're right, that you should not read the solicitation to interpret a cap, well, again, their facility, the one that they proposed and the one that they priced, based their price upon, does not meet their theory, does not survive their own flawed theory, because, again, you can hypothesize that BOP's demand will go to 60 or 70. However, again, their facility, the one that they proposed, the only one that's relevant to this procurement, again, it's a bid protest, so the only thing that's relevant are the facts that are specific to the procurement below that was before the judge. What's your response to his argument that they could have built a whole new wing onto their facility, they had no limitation? I mean, my response is that, again, that's one aspect of it that's not in the record, it was not before the trial court below. What this court is, the function of this appellate court with respect to this bid protest is to review the decision of the trial court and the facts that were before the trial court. And the judge's conclusion, based upon the record, based upon the fact that their facility, the one that they submitted, can only hold 52, and therefore, even if it could hold more, even if it's expandable, it can hold 100. Under their theory, there's no cap on the number of residents per day that an offeror must be able to accommodate. So even if you double the size, it can hold from 52 to 104, or triple it, it doesn't matter. Under their theory, it still is not responsible, because under their theory, there is some violation if you hypothesize some demand by BOP that does not meet the facility. But that's, again, that's the reason it doesn't make sense. There's no facility that can meet their theory, precisely because there's no cap. You have to read a cap into this maximum order provision in order for it to make any sense, in order for it to serve its purpose. Can you address your opponent's arguments concerning the consideration of the adverse information by BOP? The consideration of the zoning restriction? You mean, say, the adverse information? No, performance. Oh, I'm sorry. Oh, the performance information, absolutely. Well, the issue there is whether or not the BOP's consideration of finalized contract evaluation forms, as opposed to non-finalized, is arbitrary and capricious, and it's clearly not. But what the counsel did not mention was that the consideration of finalized forms is something that's pursuant to the FAR. FAR 42.1503B sets out a multi-level internal agency review process in which, one, you give the contractor, it says Shaw, give the contractor 30 days to rebut the comments made by the contracting officer, and then once that process goes through, then it goes one level above the contracting officer. So it's an entire process contemplated by the FAR, mandated by the FAR, and that happened with respect to the contractor evaluation forms that the BOP considered. And it was eminently reasonable, in fact it was mandatory, that the BOP, the Bureau of Prisons, consider those forms as opposed to ones that were not finalized. And as for interim reports or monitoring reports that document individual business as opposed to contractor evaluation forms that document an entire year, well again, the law is fairly clear, it is clear, that the agency has wide discretion in terms of what past performance references it's going to consider, and it certainly makes a lot more sense to consider an entire year's worth of information as opposed to individual business. So again, that's not arbitrary depreciation. The lower court's decision on that ground is not clearly wrong and should be upheld. Now, even if that's wrong, which it's not, BANM certainly can't show prejudice because if you review, as the trial court correctly found, if you review the non-finalized CEFs for a number of these facilities particularly, there are additional efficiencies that were shown. And that was the original reason why it got an acceptable rating for its past performance as opposed to something higher. So, no prejudice on that ground in addition to the fact that, again, if you look at all of its references, distances, references, past performance were rated much higher in terms of relevancy. All of them. As opposed to BANM, so only one of which was rated highly relevant. So again, BANM can't show that it was prejudiced by BOP's rational decision to utilize finalized contract evaluation forms. If there are any further questions, I will yield my time to Mr. Tunstall. May it please the court, very briefly, I'm here for the Intervenor Dismissed Charities. As Mr. Oliver just noted, we actually brought the zoning issue to the BOP's attention in the course of trying to compete for this procurement. I would note that our site, as a matter of fact, is substantially larger than the facility that BANM proposed. And without getting into protected material, if you look at the reference in the record to the BANM site, it's in the joint appendix at 10,456. There's a square footage attributed to their site. And then compare that to the Dismissed site, also in the joint appendix at page 10,702, you will observe that the Dismissed site, as a matter of fact, is substantially larger. The facility is larger. Isn't that irrelevant when the solicitation speaks in terms of the number of beds, and it's not square footage? It's not irrelevant at all, Your Honor. And the reason that it's not irrelevant is because the solicitation, what it actually says and speaks to is total estimated inmate days. It is an estimate. The BOP issues a solicitation, and they're doing their best to try and tell the bidders, look, this is what we anticipate. And the bidders have to come up with site, which is what my client did. And then, frankly, that's what Bantam did. But to come up... But that facility could be huge, and it doesn't matter if you're subject to the zoning restriction, right? Our facility is subject to a zoning restriction, and that was never hidden. But I can say that we've been performing at the site since September of 2010, and we are in compliance with the zoning laws. We are performing as we sit here today. There are inmates housed at the Dismissed facility in Savannah. You have to take what the government tells you with respect to estimated inmate days You have to locate a facility, and you have to build it or lease it, and then propose it to the government. And that's exactly what we did. It is a requirements-type contract. These are estimates. The bidders have to come up with a physical facility, and that's what we did. If there are estimates, what happens if, let's say on a given day, the demand is over 50? To the best of my knowledge, that has not happened. What if it were to happen? In dealing with estimates, it's possible. First of all, as your Honor noted, there is also a home confinement requirement, and it's anticipated in the solicitation that 20% of the inmate days will be on home confinement, so those don't count against the zoning restriction. And if there were a requirement that BOP had, then we would have to presumably house that resident at another facility because we're not in violation of the zoning laws. And we told the government about this up front. So there are means by which the BOP can assign residents to different facilities. I'm in my negative time. I would just say that I would also point out that the source selection decision in the record at page 11,290-96 deals with all of these issues as thorough, detailed, and well-supported, and I would submit that the trial court correctly relied upon it. Thank you. Just briefly, based upon the questioning of the court, I think you've got the issue and you fully understand the issue. I'm not going to belabor the point here, but just in response to my adversary's comments, they said that the record is limited by what was before the contracting officers at the time they made the decision, yet they want to get up and they want to say that since September 2010, you know, the level of inmates hasn't exceeded the 50. Well, that's outside the record. That's something that's really not here again. And again, we're in the game, and the whole essence of the protest here is before you get into the game, what were the rules? Okay, and the rules are very specific. As far as the home confinement issue goes, again, it's up to the Bureau of Prisons as to what they want to put out on home confinement, and I think my adversary, if I heard him right, said they could be assigned to a different facility. Well, that's not a requirement of this particular solicitation or this contract. You can't go housing people at a different facility someplace. We're talking about the facility they proposed. And as far as the past performance goes, the monitoring reports were finalized. Bantam commented to those monitoring reports and they were finalized monitoring reports, so there was recent information before the Bureau of Prisons.  Bantam was the incumbent. What you're trying to do in the solicitation process here, you're trying to evaluate as to whether or not the contractor can't perform the contract and how well they will perform the contract in the future. What better evidence that you have here is to go to their incumbencies. They've had this contract for a number of years. They had stellar ratings on this thing. Why would you downgrade them when they had the lower price, but you're downgrading them through this past performance scenario they're trying to go through. It doesn't make sense. The whole thing doesn't make sense other than to handpick or cherry pick dismissed charities and give them the contract. Nothing makes sense in the record. Thank you very much. I thank all counsel for the case you submitted.